The judgment of the United States Customs Court is *affirmed.*

UNITED STATES *v.* OTIS MCALLISTER & CO. (No. 4427)[1]

[1] C. A. D. 242.

United States Court of Customs and Patent Appeals, May 18, 1943

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.
*Lawrence & Tuttle* (George R. Tuttle of counsel) for appellee.
*Lamb & Lerch, Amici Curiae.*

[Oral argument April 6, 1943, by Mr. Weeks, Mr. Tuttle and Mr. John G. Lerch]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON Associate Judges

JACKSON, Judge, delivered the opinion of the court:

Appellee entered on April 14, 1937, an importation designated in the invoice as "stucco netting galvanized after weaving" from Hamburg, Germany. The Collector of Customs of the port of San Francisco assessed duty on the imported merchandise at 60 per centum ad valorem under paragraph 397 of the Tariff Act of 1930 as amended by a presidential proclamation, T. D. 44605, 59 Treas. Dec. 288. Paragraph 397 as far as pertinent here reads as follows:

PAR. 397. Articles or wares not specially provided for, * * * ; if composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, 45 per centum ad valorem.

and the proclamation as far as pertinent reads as follows:

And an increase in the rate of duty expressly fixed in paragraph 397 of Title I of said act on woven-wire fencing and woven-wire netting, all the foregoing composed of wire smaller than eight one-hundredths and not smaller than three one-hundredths of an inch in diameter, coated with zinc or other metal after weaving, from 45 per centum ad valorem to 60 per centum ad valorem.

The involved merchandise has the appearance of ordinary chicken wire or poultry netting, and was galvanized after it was formed. It was conceded by appellee to be wire netting, and the issue below was whether or not the merchandise was woven-wire netting within the meaning of the paragraph 397 amended as aforesaid.

The case was tried in the cities of Seattle, Wash., and San Francisco, Calif. The appellee presented the testimony of three witnesses.

The testimony of one of the witnesses pertained to a kind of wire netting identified as "lock twist" which is a different kind of netting than the involved merchandise. On motion the testimony of this witness was stricken, but was later restored for the purpose of illustrating a type of netting which in some of the testimony was said to be not woven. Another of appellee's witnesses was a clerk in the office of the appraiser of merchandise at the port of San Francisco and he merely identified a sample of domestic wire netting as being representative of the imported merchandise. That sample was received in evidence as Exhibit 1. The third witness was associated with appellee and testified that the imported merchandise "must have been made by the same process" as Exhibit 1 and that he had observed the process by which such merchandise was made in the plant of the California Wire Cloth Corporation in Oakland, Calif. The witness described the process in the following language:

The process consists of the assembly of a number of parallel wires in a machine, and every alternate wire being in the form of a long coil in a tube, and as the wires progress through the machine these alternating coils in the tubes revolve around stationary wire that is going alongside of it, thus forming the loops on the stationary wires and the interlacing.

The witness testified the process to be the "interweaving of these parallel wires as they run through the machine." He was unable to say that the wires present in the exhibit were known by any names except as to the wire along one edge of the exhibit, which he thought was called the selvedge. The foregoing constituted appellee's entire case.

The Government called five witnesses, all of whom were associated with various domestic steel fabricating companies. The testimonial record on behalf of appellant may be briefly summarized as follows: That the imported merchandise comprising steel wires, woven into articles of hexagonal pattern and galvanized after weaving, was made on a loom by a process wherein every alternate wire was twisted around the adjoining wires.

The Government introduced exhibits consisting of a trade catalog, price lists, bills of sale, photographs of the machine used by the California Wire Cloth Corporation to make netting similar to the imported merchandise, and a Federal Standard Stock Catalog giving the Federal specifications for "FENCING; WIRE (BARBED, NETTING AND WOVEN), BLACK AND GALVANIZED." In the latter catalog under the heading of *"Workmanship"* we find that "On all Type C hexagon wire netting the zinc coating shall be done after weaving." The trade catalog illustrates hexagonal netting similar in appearance to the involved merchandise and described as "STEEL WIRE NETTING—GALVANIZED BEFORE OR AFTER WEAVING." The photographs show a rather complicated

machine in which there are spools upon which wires are wound. Those wires, designated as warp wires, are unwound from the spools and enter the machine at its base, running to nearly the top thereof between tubes filled in spiral formation with what appellant's witnesses termed weft or filling wires.

It was testified in the following language that in making wire netting on said machine, the weft wires are caused to interlace with the alternate warp wires:

Approximately 50 percent of the wires are fed in either from spools or from a coil of wire, the coil being in a bundle. These wires are fed underneath the roller at the base of the machine and are stationary. They cannot be twisted without becoming untwisted, inasmuch as they are fastened both at the top and bottom. They are fastened by going through at the bottom and going into the cloth at the top. Approximately 50 percent of the wires are formed on a bobbin coiling machine. Long coils are inserted in the top. They are loose, and can be moved. Those are the filling wires, and they can be moved back and forth between what we call the warp wires, and as they are moved from one wire to the other they twist as they cross each wire. That makes a twist motion. After that twist has been made it is pulled up over a peg roller and wound into the package and taken off the machine.

Several Government exhibits consist of specifications for hexagonal wire netting made on said machine using the letters W, F, and S as abbreviations for warp, filler, and selvedge wires. It was also shown that hexagonal netting similar to that here involved was sold by the California Wire Cloth Corporation bearing a tag on which the expression "galvanized after weaving" appears.

Upon that record the United States Customs Court, Second Division, sustained the claim made in the protest and gave judgment for appellee citing as authority its own decision in *Wilbur Ellis Co.* v. *United States*, 6 Cust. Ct. 57, C. D. 426, and the decision of this court in the case of *Cron & Dehn Hardware Corp. et al.* v. *United States*, 18 C. C. P. A. (Customs) 445, T. D. 44699. From the judgment this appeal was taken.

The brief of appellee in support of its contention that the involved merchandise is not within the common meaning of the term "woven-wire netting" relies upon the decision of the trial court and the decisions therein cited.

Much of the briefs of both parties is devoted to a discussion of the record in the *Cron & Dehn* case, *supra*. The record in that case is not in evidence here and will not be considered. Neither will we consider the arguments based upon that record. *Smith & Co.* v. *United States*, 11 Ct. Cust. Appls. 121, T. D. 38899.

In its decision in the instant case the trial court, in citing the *Wilbur Ellis Co.* case, *supra*, stated that precisely similar merchandise with that involved here was not woven-wire netting and therefore not subject to the said presidential proclamation. That case, however,

according to the decision, was submitted upon a stipulation "that the merchandise consists of wire netting with no weft or filling wires." In view of the rather full testimonial and documentary record made here we do not believe that that case, which was not appealed, may be here applied.

The case of *Cron & Dehn Hardware Corp.*, *supra*, likewise has no application here. In that case the opinion sets out that the involved merchandise consisted of galvanized wire netting composed of steel wires and used as reinforcement in cement walls and other structures. It was assessed for duty by the Collector of Customs at the port of San Francisco under paragraph 399 of the Tariff Act of 1922 (the prototype of paragraph 397 of the Tariff Act of 1930), as articles or wares composed of metal not specially provided for at 40 per centum ad valorem. The appellant protested the action of the collector and claimed the merchandise to be dutiable as woven-wire fabric at 25 per centum ad valorem under paragraph 318 of the Tariff Act of 1922. That paragraph provided for the dutiable status of "Woven-wire cloth: Gauze, fabric, or screen, * * * ." There was no evidence in that case, as is pointed out in the opinion, that the merchandise contained filling or weft wires. The opinion further stated that it appeared from the evidence that the involved merchandise and woven-wire cloth were made by entirely different processes. This court affirmed the judgment of the lower court and held that the galvanized wire netting was properly dutiable under said paragraph 399. The court further held on the record therein and in accordance with definitions of the terms "weave" and "weaving" quoted from Funk & Wagnalls New Standard Dictionary and the Encyclopaedia Britannica that under the commonly understood meaning of those terms the merchandise was not woven.

The opinion in that case should be read in the light of the issue presented; i. e., was the merchandise properly dutiable as claimed by appellant? In concluding that it was not so dutiable this court stated: "It would seem to be clear that the Congress intended to limit the provisions of paragraph 318 to woven-wire cloth, whether gauze, fabric, or screen, having both warp and filling or weft wires." It is clear that the merchandise was not woven as cloth is woven and accordingly it was properly held to be not woven.

Inasmuch as in the *Cron & Dehn* case, *supra*, the narrow common meaning of the terms "weave" and "weaving" was applied to woven-wire cloth as contrasted with the imported merchandise the broader meaning of those terms was not quoted in the decision because not necessary thereto.

It will be readily observed that the record in the present case differs materially from that in the *Cron & Dehn* case, *supra*, in that it is shown herein that the involved merchandise was made on a loom

with warp, so-called weft wires, and bobbins, and it further appears that the apparatus and process employed in the manufacture of the merchandise herein are quite similar to those used in weaving textiles from cotton.

The merchandise involved herein is not woven as cloth is woven for the reason that there is no weft or filler which traverses the warp wires from selvedge to selvedge. As the finished article appears, all of the wires run generally in the same longitudinal direction and it would be difficult if not impossible to determine by visual examination which are warp wires and which are the so-called weft wires. In the fabrication of the article, however, it is clear that every second wire (so-called weft) is twisted alternately around the warp wires on either side of it, resulting in the hexagonal form of the mesh.

We do not think that the involved merchandise can properly be said to consist of warp and weft or filling wires as commonly understood. However, we are of opinion that the goods properly respond to the term "woven-wire netting" as that term is commonly known. They were invoiced as netting "galvanized after weaving"; one of appellant's witnesses testified the process of making the merchandise to be an "interweaving" of the wires which enter into its construction; the testimony of the witnesses for appellant was to the effect that the goods were woven; the documentary evidence describes articles such as those at bar to have been woven; Funk & Wagnalls New Standard Dictionary defines the verb "weave" broadly as "to insert by intertwining"; Webster's New International Dictionary contains a similar broad definition; and we find an article in the Encyclopaedia Britannica, Fourteenth Edition, 1929, volume 23 at page 674, reading as follows:

WIRE MANUFACTURES. In addition to steel ropes, cables, barbed wire, nails and wire springs (*see* sections under these headings), wire is *woven* or shaped into an almost infinite variety of articles; the chief of these being wire-netting which is manufactured in many designs and sizes. The commonest form of wire-netting is that which is hexagonal in shape and which is *woven by the twisting together of wires*, this operation being carried out with a very ingenious kind of *loom*.

As will be seen in the illustration the hexagonal meshes are respectively formed by the twisting together of two wires, this being brought about by the passing through the *loom* of line wires which are unwound from *bobbins* and wires which are pulled out from the *shuttles*—these latter wires being in the form of a spiral. The spirals or springs, as they are called, are very rapidly wound on to mandrils, this being carried out by four *spindles* running in parallel, the wire being guided on quite evenly and automatically until the required thickness of spring has been made. The *spindles* on to which the wire is wrapped are slightly tapered, consequently, after the full quantity of wire required has been spun on same they can be removed from the machine and the springs easily detached or slipped off by slight end knocking.

The *shuttle* on the *loom* is in the form of a cylindrical pipe with an opening on the side at the upper end, the ends of the *shuttles* being fitted to what are known as split pinions. The operator charges a *shuttle* with one of the springs, connecting

the free end of wire of the spring to the end of the wire on the netting which has just been drawn from the *shuttle*. The operation of twisting is carried out by a *shuttle* spinning round its corresponding free wire, which is shown passing up from the *bobbin*. Whilst the wire is being twisted the netting is at the same time carried forward by the driven rollers on top.

In this way the two wires are twisted and so form one of the sides of the hexagon mesh. After one set of twists is made the *shuttles* are then moved to right or left by two reciprocating horizontal beams which carry with them the half-split pinions at the top and bottom of the *shuttle* to join up with the half-split pinions of an adjoining *shuttle*. As soon as the split-pinions are fixed in their new position a toothed horizontal rack moves forward or backward as the case may be rotating the pinions and thus making the following twist on the wire. From this motion it will at once be seen that the twists on netting are alternately right-hand and left-hand. [Italics supplied, except *see*.]

In view of what has heretofore been said we think that the natural and ordinary meaning of the term "woven-wire netting" certainly includes merchandise such as is here involved. Therefore, the judgment appealed from is *reversed*.